Good morning, Your Honors, and may it please the Court, Dale Ogden for James Jordan McClain. I'll try to reserve two minutes of my time for rebuttal, and I'll keep an eye on the clock. All right. The State suppressed the best evidence that Mr. McClain had in his defense. At trial, they had charged him with first-degree premeditated murder, and his defense was either self-defense or a lesser form of homicide. And the evidence that they suppressed confirmed that defense. Specifically, Ms. Georgia Brown, who we only knew then as famous, stated that Mr. McClain was escorting her to her vehicle. While that was happening, Ford, the decedent, struck Mr. McClain hard on the side of the head, causing her to fall and Mr. McClain to stumble. And only then did Mr. McClain take out his firearm and shoot. Ms. Brown told all this to a Santa Ana police officer, but they never disclosed it, and they suppressed that evidence. Your Honors, that is a straightforward Brady violation, and based on that straightforward violation, I've asked this Court to reverse and remand to grant the writ. Turning first to the Brady violation, unless the Court has any other questions. Can you address timeliness? I'm not sure how it is that the petition is timely, given what your client knew, when he knew it, and when he filed. Absolutely, Your Honors. And the petition is timely because of equitable tolling, the reasons we lay out in the briefs. And I would first point out that this was a fact-finding exercise that the magistrate judge engaged in below, and the State did not object to any of those facts below. So first I would say the timeliness issue is foreclosed or waived. So if we don't agree with that, when would you say that the time began to run? 2016, Your Honor, and I'll explain why. Ms. Brown reached out in response to one of the advertisements that Mr. McClain's family took out sometime in 2013, but Mr. McClain didn't know the information that she had until 2016. Specifically, in 2015, Ms. Brown writes the letter to the Orange County Superior Court explaining the exculpatory information she has, and then Mr. McClain writes over and over again trying to get a copy of that. But because I believe the reason was it was deemed some sort of ex parte communication, it took him a while to get a copy of that. Didn't he get a copy in January of 2016? Around that time. I don't know if it was January, but it was in 2016, Your Honor. So in your view, that's the triggering time period for when equitable tolling stops and the time starts to run. Well, I don't think equitable tolling stops at that point. At that point, I'll explain moving forward from there. Mr. McClain continues to reach out to jailhouse lawyers, to family. He keeps reaching out to Ms. Brown trying to get an affidavit because he wanted to try to prove his state habeas case. So he's asking over and over to get the evidence that he needs to make his claim. And while he's doing that, he's reaching out to attorneys, wrongful conviction avenues of relief, you know, Loyal Innocence Project, reaches out to the Orange County District Attorney's Conviction Integrity Unit. This is an ongoing thing where he's trying to get help. And equitable tolling only requires reasonable diligence. And I would submit that, you know, trying to get the evidence you need and asking every relevant party for help is as diligent as somebody could be. His first state petition essentially was dismissed by the state court because it was not sworn. Isn't that correct? And then finally, two years later in 2019, he submitted the sworn affidavit. Is that right? That's as I read the first Superior Court order. And what was the reason for the delay of two years in going from an unsworn affidavit to a sworn affidavit? Oh, yes, Your Honor. The delay was caused externally, Mr. McClain. Once Ms. Brown had gotten the Superior Court's response to her letter, she was absolutely done with the matter. She didn't want to get involved again. She refused to cooperate. Is that what the record indicates? Yeah, as of 2015, yes, Your Honor. Because it's scary, right? It's scary to get a letter from a court saying, you know, this is unsworn, I'm rejecting this, that type of thing. I think that scared her. In 2019, as she explains in her affidavit below, she starts to feel bad that, you know, this man has been in prison for so long without the jury. Then in 2019, it was a sworn affidavit, but then it was dismissed by the state court as being successive. Correct, Your Honor. That's the catch-22 that Mr. McClain was put in. Counsel, going back to your Brady claim, can you address the prejudice issue, assuming you get past the timeliness issue? Absolutely, Your Honor. I think prejudice here is manifest for a few reasons, the first one being the potential of a lesser conviction or a self-defense, you know, acquittal. Self-defense is established by Ms. Brown's statements, largely because, you know, Willie Ford, a 6'5", large man, strikes Mr. McClain on the side of the head unprovoked. You know, that's the type of thing that leads to self-defense. But maybe more clearly, it's the thing that at least proves that there was no premeditation, right? It could be voluntary manslaughter because it was a sudden quarrel, which is one of the ways it can be voluntary manslaughter under California law, or it's what we call imperfect self-defense, right? Even if Mr. McClain acted excessively, he still had the honest belief in the need to defend himself, and that would be voluntary manslaughter. There was evidence in the record that Mr. McClain continued to shoot even as Ford was fleeing. Doesn't that undercut the self-defense claim? That's why I believe that some of the courts have looked at this and said, you know, that might have been unreasonable or excessive, but that's sort of the core of why voluntary manslaughter would be the lesser conviction, because even if he acted excessively, it's still his subjective intent, you know, not to take a life, but in this sort of heat of the passion, heat of the moment, sudden quarrel, you know, defense effort. But as far as the shots from behind him, I think what can be missed here is how quickly this all happened. By all accounts, this was an extremely quick succession of shots. For instance, Leo Parker Jr. testifies that, you know, bam, there was a fight, bam, bam, bam, in very quick succession. And the first shot to the left flank, there was some disputed trial as, you know, that could have been in a turning motion, i.e. the boxing pose that St. Anthony Fox mentions, or from behind, right? So that was a disputed fact at trial that could have gone towards self-defense or, you know, against. So that was a disputed fact. And moving on to the other elements of Brady prejudice, I think it's important to note that this court in Renoso has mentioned, you know, when the prosecutor sort of takes advantage of the violation, of the Brady violation, that that is another fact demonstrating prejudice. And multiple times in closing, this prosecutor mentions, you know, the reliance on famous is misplaced. She says, quote, the defense attorney is playing a big issue about famous. Where is famous? Moving on, implying that if famous was produced, famous could somehow help the defense in this case. There's no evidence of that. So much like in Renoso, not only did the Brady violation happen, but the prosecutor took advantage of it. I would also flag the jury notes. They request the difference between first and second degree murder. They request 12 copies of those instructions, and they request Mr. McClain's testimony. In other words, they were closely considering the difference between first and second degree murder, and even second degree murder would have been a significantly less severe charge, and Mr. McClain likely would have long since served that sentence. This case indicates that both the government and the defense were trying to find famous Ms. Brown, and no one could find her. Is that right? The defense certainly was. We, on this record, we don't know exactly who suppressed the evidence, right? So there was testimony from, I believe, Officer Vasquez that she tried to call the number. She didn't have the picture, so we don't know if they wrote everything down correctly. She did testify to looking for famous. And certainly the defense, over and over again, was looking for famous as they tried to they filed motions based on her unavailability, right? I know you wanted to save a little time. Yeah. Thank you, Your Honors. Good morning, and may it please the Court. Vincent LaPietra on behalf of the Warden. The district court in this case properly denied these claims as meritless. Petitioner's entire Brady claim is premised upon the notion that disclosure of the statement would somehow result in famous' appearance at trial, and there is simply no evidence in support of this conclusion, just the opposite. Taken in context, Ms. Brown's statement establishes that she received a page from an unknown number which she called and determined to be from the police department, who she spoke to for a short period, giving a statement. Then the rest of the record lets us know that somebody from the police department attempted to follow up by calling that number, which was no longer in service. That number was fully disclosed to the defense, who also attempted to try to call the number and was unsuccessful. The phone company was unable to determine who owned the phone number at the time of the shooting, and based upon all of this evidence, the only reasonable conclusion is that Ms. Brown knew the police were trying to talk to her, told her that they would follow up with her, and that she was intentionally absconding. So there is absolutely no reason to believe that disclosure of this statement, assuming it to be given and fully true, would have resulted in any difference at trial. The statement itself was not admissible. Bearing her testimony, it wouldn't have been used for impeachment, and at best, as I argued in the brief, the jury would have been told that there was a witness who made the statement who was no longer available or no longer willing to come forward. That's hardly credible evidence from which the jury, having heard from Mr. Brown himself, excuse me, Mr. McClain himself, about the purported self-defense and version of events, having fully considered it, requested jury instructions and other information, and rejected that testimony as not credible. There is no reason to believe that providing this statement would have resulted in any different outcome, and therefore, that Brady's claim is properly denied as meritless. Did the district court, in fact, did the court not find that it was immaterial? Yes, Your Honor. And I guess I have trouble with the fact that the standard really is reasonable probability of a different result. It's not whether it's immaterial or not. And I'm not really sure, given that everyone seems to agree that she was the centerpiece of this entire conflict, and some effort was made to find her. I'm having trouble finding at least how her testimony would be immaterial, so that a jury would discredit her. A jury may not believe her, but how would it be immaterial? I think a lot of courts— Correct me if I'm mistaken, but the district court found that it was immaterial, correct? Well, yes, Your Honor. I think that a lot of courts and attorneys as well conflate the elements of Brady and use the phrase materiality in terms of prejudice, but one of the—the third Brady element is, as you mentioned, reasonable probability of a more likely—or a more favorable outcome. And that's what the district court was finding, that there was no reasonable likelihood of a better outcome. Because the Ninth Circuit in the Jernigan case seems to— this circuit seems to have defined that the burden is to show that the government's evidentiary suppression may undermine confidence in the outcome of the trial, not the matter of materiality. It seems that the standard clearly set by the Ninth Circuit is different than that which you're suggesting under the Jernigan case. Well, I think that's just a different way of saying reasonable probability of a more favorable outcome is that it undermines confidence in the outcome. I think those are synonymous standards, and I think either of them— the state of the evidence in any way whatsoever. The record clearly indicates that Ms. Brown, then known as famous, was absolutely the centerpiece of this entire controversy, correct? I mean, she was right there. She was asked—apparently the record indicates she asked if someone would take her to her car, and she was concerned. I mean, she was right there at the centerpiece of the conflict, was she not? Yes, Your Honor, she was at the centerpiece of this conflict. However, as I mentioned, the evidence as a whole, the state of the trial, the record— I understand, yeah. She wouldn't have been there. She didn't want to be there. She wasn't going to be there. I understand that she may have regret now, two decades later, but we have to look at the facts on the ground at the time that this occurred. Counsel didn't mention the trombetta, which is another aspect of this claim for failing to disclose the photograph, but as the government set out in its brief, there was absolutely no exculpatory value in that photograph at the time of the investigation, and because there was absolutely no bad faith on the part of the police, that claim was probably denied as meritless as well. Unless there are any questions, Government Smiths? Do you have any additional questions? No, I do not. All right, thank you very much. Thank you, Your Honor. Let's put two minutes on the clock. Thank you, Your Honor. Judge Forrest, your question earlier, I should clarify that the triggering date under AEDPA is a little bit of a separate question than whether equitable tolling applies. Equitable tolling just requires that reasonable diligence and extraordinary circumstances standing in Mr. McClain's way. So I should clarify, because this Court has explained that this is not like the arena of bright lines and dates certain. No, I understand that, but the standard under AEDPA is that once you have a basis for understanding your claim, then equitable tolling stops, and you've got to advance your claim. You've got to bring it, right? And so what I was asking is, from your perspective, when is that time when it's now time to bring your claim you know enough to bring it, right? Because I agree with you that there's at least a period of time where some tolling should apply because there were barriers to him understanding the nature of the Brady claim. I mean, I think you could argue about that, but I would just say that's probably true for some period of time. So I guess just to clarify, what is your position? When did he know enough to be able to bring his claim? Well, he knew the factual basis of the claim in 2016 when I mentioned. And isn't that the standard under AEDPA, that once you know the factual basis, you've got to bring it? Because we have case law that says that you don't have to know the legal significance necessarily. You have to know the factual basis. But even at that point, equitable tolling can continue to apply as long as you're diligently pursuing your rights. And I'm just submitting that Mr. McClain was at least since that time and the whole time period. I guess I don't understand that. So diligently pursuing your rights. So if you know the factual basis and AEDPA says that's the trigger for when you need to bring your claim, what else is there to do to diligently pursue your rights than to bring the claim? To gather the evidence in support of your claim. So I guess that goes to the argument of he wanted an affidavit, a sworn affidavit, as opposed to just a statement or a description of what she would have said. My difficulty there is ultimately what he filed two years later, essentially, right, December of 2017, didn't have the affidavit. Well, at a certain point he realized Ms. Brown was ignoring him, right? So at a certain point he had to pull the trigger and file. I think if he had waited, you know, decades, we'd be looking at that going, well, at a certain point you need to pull the trigger and file the state habeas petition. So his argument then that he waited and delayed because he thought the law required him to file a sworn affidavit, but at some point he realized he wasn't going to get it and then acted? I believe that's correct. And, I mean, that's what the first state habeas court told him to do, as Judge Bennett mentioned. So what do we do with, because my review of the law here is that that state habeas court, the first court that did the state petition was wrong on the California law. California doesn't require a sworn statement. That's correct. So we're in federal habeas now. What do we do with the fact that the state court got its own law wrong? Well, that's another reason I think equitable tolling is applicable here, because that's an external factor to Mr. McClain, right? He couldn't control what the court said. That doesn't make sense to me, because if he knew the factual basis in early 2016, he could have filed his petition at any point within a year of that point. And even if the state court had made the same error that it made here, he would have been fined for federal habeas purposes. So the fact that the state court got the law wrong well after, it seems to me, that the AEDPA statute has run, that's not a barrier to him. And I don't know, like he didn't delay more than a year beyond his understanding of the factual basis because the state court got the law wrong, because he didn't know that yet. Right? That hadn't happened. Well, and I think this court has pointed out at least in—I see my time is way up, Your Honor. Go ahead and answer the question, please. This court has explained in other contexts that equitable tolling does allow for the— well, not equitable tolling, but the Schlup case that I cite in the brief talks about three years not being unreasonable for the California Innocence Project to locate witnesses and gather declarations and things like that. Because in equitable tolling, we're really asking whether somebody is diligently pursuing their rights, not the sort of technicalities that can accompany habeas. So Mr. McLean is out there diligently pursuing his rights trying to get this evidence, and that is enough for AEDPA purposes to toll in equity the statute of limitations. And I think the Weaver case does a good job of explaining that, you know, whatever he could have done federally, he's still actively litigating a state habeas proceeding, and that is still reasonably diligent. All right. Thank you very much. Our questions took you over time. Judge Bennett, did you have a question? No, I'm fine. Thank you. Thank you to both sides for your argument today. The matter is submitted for decision by this court in due course.
judges: NGUYEN, FORREST, Bennett